(41 Misc. Rep. 171.)

### BLUME v. INTERURBAN ST. RY. CO.

(Municipal Court of the City of New York, Borough of Manhattan, Eleventh District.  June, 1903.)

**1. CARRIERS—STREET RAILROADS—TRANSFERS—STATUTE—OBLIGATION.**

Railroad Law (Laws 1890, p. 1106, c. 565) § 78, provides that railroad corporations or any corporation owning or operating any railroad or railroad routes within the state, may contract with any other corporation for the use of their respective routes or roads, or any part thereof, and thereafter use the same in such manner and for such time as may be prescribed by such contract.  Section 105 (page 1114) requires every such corporation entering into such a contract to carry between any two points on the railroad or portion thereof embraced within the contract any passenger desiring to make a trip between such points, for a single fare, not higher than the lawful fare charged by such corporation for one adult passenger, and to issue transfers evidencing the passenger's right to such continuous passage.  *Held*, that such section applied to the Interurban Street Railway Company, of the city of New York, and required it to give transfers over all the lines of its system wholly within the limits of the city of New York for a single fare.

**2. SAME—CONSTITUTIONAL LAW—POLICE POWER—DEPRIVATION OF PROPERTY.**

Such sections were a proper exercise of the state's police power, and were not unconstitutional, as tending to diminish the business of the company or impair the salability of its property.

Action by Paul Blume against the Interurban Street Railway Company to recover certain penalties for refusal of transfers.  Judgment for plaintiff.

Julius Henry Cohen (Edward B. Whitney, Henry B. B. Stapler, J. Aspinwall Hodge, Jr., James S. Lehmaier, George W. Kirchwey, Horace E. Deming, Newell Martin, Franklin Pierce, John Ford, William M. Bennett, and Alfred P. W. Seaman, of counsel), for plaintiff.

Henry A. Robinson (Arthur K. Wing and Eugene Treadwell, of counsel), for defendant.

WORCESTER, J.  This action is brought to recover penalties amounting to $200 by reason of the defendant's having refused plaintiff transfers on four different occasions from and to railroad lines operated by it.  There is no doubt, upon the evidence, that these transfers were asked for in good faith by the plaintiff, and that they were refused by defendant's agents.

The plaintiff claims that he is entitled to a penalty for each refusal, under the provisions of section 105 of the railroad law (Laws 1890, p. 1114, c. 565), which is as follows:

"Sec. 105. Contracting Corporations to Carry for One Fare.—Penalty. Every such corporation entering into such contract shall carry or permit any other party thereto to carry between any two points on the railroads or portions thereof embraced in such contract any passenger desiring to make one continuous trip between such points for one single fare, not higher than the fare lawfully chargeable by either of such corporations for one adult passenger. Every such corporation shall upon demand, and without extra charge, give to each passenger paying one single fare a transfer, entitling such passenger to one continuous trip to any point or portion of any railroad embraced in such contract, to the end that the public convenience may be promoted by the

operation of the railroads embraced in such contract substantially as a single railroad with a single rate of fare. For, every refusal to comply with the requirements of this section the corporation so refusing shall forfeit fifty dollars to the aggrieved party. The provisions of this section shall only apply to railroads wholly within the limits of any one incorporated city or village."

To ascertain what the "such corporations" and the "such contracts" referred to in section 105 are, we must refer back to section 78 of the Railroad Law (page 1106), which reads, in part, as follows:

"Any railroad corporation or any corporation owning or operating any railroad or railroad route within this state, may contract with any other such corporation for the use of their respective roads or routes, or any part thereof, and theeafter use the same in such manner and for such time as may be prescribed in such contract. * * * The road of a corporation cannot be used under any such contract in a manner inconsistent with the provisions of law applicable to its use by the corporation owning same at the time of the execution of the contract."

Section 78 has been held to be, as to the parts quoted above, a re-enactment of chapter 218, p. 195, of the Laws of 1839. Section 105 is a re-enactment, after various amendments, of chapter 305, p. 525, of the Laws of 1885.

Under the Law of 1839, railroad corporations have made contracts, under the names of "leases," which at least have a tendency to destroy competition and create monopolies; and it was doubtless the intention of the Legislature, to restrain this tendency, to provide a remedy for it, and to secure for the people, in the way of transfers, advantages which they might lose if such contracts were allowed between what might be otherwise competing railroads, that section 104 was enacted; and it is with this intention in view that it should be construed. The "such corporations" referred to in section 104 are railroad corporations, or corporations owning or operating any railroad. It appears from the original complaint, and is admitted by the answer, that the defendant is a railroad corporation, and in the Metropolitan lease it is described as a railroad corporation. The proof, however, whether material or not, shows that it was in fact a corporation owning a railroad, rather than a railroad corporation, at the time of the making of the lease; and the question to be determined is, is the Interurban Street Railway "such" a corporation as is referred to in section 105? The defendant claims that it is not, for the reason that at the time the lease was entered into the corporation merely owned a line of railroad in Westchester county, which was in no way connected with the Metropolitan systems, and therefore was not a corporation owning any railroad, as to which a contract could be made with the Metropolitan Company "for the use of their respective roads." It seems to me that this position is not well taken. As far as the public is concerned, the thing to be guarded against is the doing away with competition. The contract clearly brings all the lines operated by the Metropolitan Railroad under one management, and causes them all to be operated in the same interests, and the effect is the same whether the Interurban's road was embraced in the contract or not. As it is a corporation owning a railroad, and has entered into a contract of the kind referred to in the statute, it is amenable to the penalties imposed by the statute.

But even supposing that the Interurban is not "such" a corporation, the Third Avenue Company and the Metropolitan Company, before the lease of the Third Avenue to the Metropolitan, were, beyond any question, "such" corporations, and the Third Avenue and Metropolitan lease was "such" a contract as is referred to in section 105. While this lease demises certain lines of the Third Avenue system which extend outside of the city limits, I do not think that that fact takes from the operation of the statute the railroads of that system which are wholly within the city limits. The reasonable construction of the last sentence of section 105 seems to me to be that a passenger shall be allowed to take a trip for one fare anywhere within the limits of any one city or village, and it is only when he is carried outside such limits that he can be compelled to pay another fare. Inasmuch as the Interurban has assumed to operate both the Metropolitan and Third Avenue systems, it must be held responsible for all the liabilities incurred by either of those companies in such operation. The defendant, in the Interurban-Metropolitan lease, expressly assumes this liability in section 6 thereof; and, if necessary, the complaint herein could be amended so as to conform to the proof in that respect. That the Metropolitan and Third Avenue systems were competing systems has been very forcibly proved by the defendant in this action, in showing that many common points could be reached by either one of the systems without the help of the other. I do not think the Manhattan contract affects this question. See Buffalo East Side R. Co. v. Buffalo Street R. Co., 111 N. Y. 140, 19 N. E. 65, 2 L. R. A. 284, where it is held "that the authority of the Legislature in the exercise of its police powers could not be limited or restricted by the provisions of contracts between individuals or corporations. 'Pacta privata publico juri derogare non possunt.'"

It is, however, claimed on the part of the defendant that under the decision in Ingersoll v. Nassau Electric R. Co., 157 N. Y. 453, 52 N. E. 545, 43 L. R. A. 236, inasmuch as all the lines over which transfers were demanded as alleged in the complaint were organized and in operation prior to the year 1885, the corporations then owning and operating them were fully empowered to lease them under the provisions of chapter 218, p. 195, of the Laws of 1839, and to so lease them free from any of the conditions imposed by section 105. It must doubtless be admitted that, under the Ingersoll decision, such corporations have certain rights which cannot be taken away from them. It is there held that:

"A perfected railroad franchise, constituted either by direct legislative grant, or by consent of local authorities and property owners, in pursuance of the Constitutional and general laws, especially when followed by actual construction and operation, is a property right that cannot be afterwards taken away or diminished, either by subsequent constitutional amendment or by legislative or municipal action, except in the exercise of the police power or the right of eminent domain. * * * 'Salability is an essential element of property, and the destruction or the diminution thereof is a taking of property that cannot be done except through the exercise of the right of eminent domain or of the police power.' Also that the 'right or privilege to contract for its use with other railroads, and thereby derive a profit, was as much a part of its franchise as was the right to lay its tracks or operate its cars.'"

The questions to be decided here, however, it seems to me, are: First, is not the regulation of fares as provided for in section 105 an exercise of the police power? And second, does such regulation tend to affect the destruction or diminution of the salability of property?

As to the first question, that is answered in the case of Buffalo East Side R. Co. v. Buffalo Street R. Co., above cited. In that case we read:

" 'Railroad corporations hold their property and exercise their functions for the public benefit, and they are therefore subject to legislative control. The Legislature which has created them may regulate the mode in which they shall transact their business, the price which they shall charge for transportation of freight and passengers. * * * It may make all such regulations as are appropriate to protect the lives of persons carried upon railroads, or passing upon highways crossed by railroads. All this is within the domain of legislative power, although the power to alter and amend the charters of such corporations has not been reserved. * * * Such legislation violates no contract, takes away no property, and interferes with no vested right.' "

As to the second question, it would seem from the defendant's claim in this action that the giving of transfers, "like the quality of mercy, is not strained," is on no compulsion—but that the giving of transfers, as far as they have given them, is done for good business reasons on their part. It promotes traffic and increases profits, and "it blesses him that gives and him that takes." So how can it be argued that the giving of transfers at the points where the plaintiff demanded them would cause necessarily any diminution of business or impair the salability of the roads. The defendant has been at much pains in its evidence and the brief submitted by its counsel to show that absurd results could arise from the giving of transfers at all points where demanded by passengers. Section 105 protects the railroads in this respect, to some extent, and, if not to a sufficient extent, it is not the fault of the courts. I refer to the clause, "to the end that the public convenience may be promoted by the operation of the railroads embraced in such contract substantially as a single railroad with a single rate of fare." Single railroads do not, as a rule, carry passengers over their roads in opposite directions for a single rate of fare, and the application of this motif in the statute can be invoked by the defendant whenever necessary to avoid the absurdities pointed out by its counsel. At any rate, there is nothing in the plaintiff's claim here to show that he desired to take trips which he could not have taken were the portions of the railroad over which he desired to pass a single railroad, operated for a single rate of fare.

It seems to me that the same questions are involved in the giving of transfers at Broadway and Twenty-Third street as at other points. The law is compulsory, that they must be given, and the fact that giving them there might cause undue crowding in the street and at the crossings is no excuse for not giving them, unless sanctioned by legislative action.

Judgment for plaintiff.